**FIRST VALLEY BANK, Appellant (Defendant Below),**

v.

**FIRST SAVINGS AND LOAN ASSOCIATION OF CENTRAL INDIANA, Appellee (Plaintiff Below).**

**No. 2–1175A323.**

Court of Appeals of Indiana, Second District.

Dec. 1, 1980.

---

Fred G. Donnersberger, Hammond, for
appellant; Wilson, Donnersberger & Reid,
Hammond, of counsel.

Charles H. Dickmann, James E. Freeman, Jr., Anderson, for appellee; Sansberry, Dickmann, Dickmann & Freeman, Anderson, of counsel.

BUCHANAN, Chief Judge.

## CASE SUMMARY

First Valley Bank (Bank) brings a consolidated appeal from eighteen separate summary judgments in three different courts, all holding the Bank liable as an endorser with recourse of mortgage notes which the Bank had assigned to First Savings & Loan Association of Central Indiana (Association), claiming real estate mortgage notes are not negotiable instruments, that there was a genuine issue of material fact as to recourse against it, that an unsolicited form of judgment should not have been used and attorneys fees were improperly awarded.

We affirm.

## FACTS

Throughout the decade 1960 to 1969, the Bank, then doing business as Twin City State Bank in Gas City, Indiana, made loans secured by real estate mortgages. In that same period, the Bank sold to the Association, then doing business as First Savings & Loan Association of Madison County, some six million dollars worth of those mortgages. It appears that such sales were made at least once in every year from 1962 to 1968.

The transfer of the mortgages was accomplished by an assignment in the following words:

FOR VALUE RECEIVED, the undersigned TWIN CITY STATE BANK, hereby sells, transfers, sets over and assigns to the ANDERSON LOAN ASSOCIATION, its entire right, title, and interest in and to each and all of the following described bona fide mortgages executed to or held by the undersigned, all prior mortgages held by the undersigned, all prior mortgages held by the assignor having been fully paid and released, together with all of the promissory notes and any other indebtedness thereby secured which said mortgages are hereinafter described

and identified by the names of the mortgagors, the dates of execution, and the amounts of the original loans, the book and page of recordings in Grant County, Indiana, and the exact principal balances due on each at this transfer date as follows: [a list then followed]

The promissory notes secured by the mortgages were endorsed:

"We hereby assign the within note to First Savings & Loan Ass'n.
[Date]
Twin City State Bank
/s/ Donald F. Hundley
Donald F. Hundley, Pres."

Under a separate agreement, the Bank continued to service the loans for the Association. The Bank did not carry any indication on its books that the notes were negotiated with or without recourse, and the Bank repeatedly informed the examiners of the State Department of Financial Institutions that the Bank had no liabilities that did not appear on its books, and that the Bank had not guaranteed any obligation, except as noted on its books. In the course of the examination of the Bank conducted in 1969, the Department of Financial Institutions transmitted to the Association a list of the real estate mortgages which the Association had purchased from the Bank. The Department asked that the list be verified, and that the Association "Indicate how each loan was purchased as to *RECOURSE, REPURCHASE* or *WITHOUT RECOURSE* agreement.*" The Association's answer to this request contained nothing that was responsive to the question on recourse. In his deposition, the president of the Association said that he did not know the answer to that question, and simply forwarded copies of a mortgage assignment and the servicing agreement, in the hope that this would satisfy the Department.

At least thirty-five of these mortgages became delinquent, and over a period running from June 12, 1972, to January 9, 1973, the Association filed complaints in the eighteen cases before us in the Grant Circuit Court seeking foreclosure of the mortgages,

and judgment on the notes. In all but the first few cases, the Association named the Bank as a defendant, on the theory that the Association had recourse against the Bank as an endorser of the notes; the first few complaints did not mention the Bank, but were amended to do so. All eighteen cases were re–venued, as follows: Six to the Tipton Circuit Court; seven to the Miami Circuit Court; and five to the Wells Circuit Court.

With respect to the Bank, all of these cases were disposed of by summary judgment in favor of the Association. In all cases, it was found that the Bank had endorsed the mortgage notes without qualification, and that its liability to the Association was governed solely by the applicable law of negotiable instruments. As to those mortgage notes which were transferred after July 1, 1964, the applicable law was § 3–414(1) of the Indiana Uniform Commercial Code (UCC). Ind.Code 1971, § 26–1–3–414(1). As to notes transferred before that date, the applicable law was § 66 of the Indiana Uniform Negotiable Instruments Law (NIL). Indiana Annot. Statutes § 19–507 (Burns, 1950). Judgments were therefore entered in the Association's favor in the amount of the unpaid balance on the mortgage notes, plus "interest, taxes, insurance, attorney fees and other accrued costs as provided in" the notes and mortgages. *See, e. g.,* Transcript Volume 6, page 246.

The findings of fact, conclusions of law, and entries of judgment were in most of the cases entered by forms supplied to the courts by the Association. The findings and judgments of the trial courts in these cases are therefore identical, with the exceptions of names, dates, dollar amounts, and citations to the UCC and NIL. These details were supplied by the Association, and the forms were signed by the three respective judges. Nothing in the record indicates that any of the trial judges solicit-

ed proposed findings of fact and conclusions of law from either party.

## ISSUES

The Bank presents four issues:
1. Are notes which are secured by mortgages of real estate negotiable instruments within the purview of the Uniform Commercial Code?
2. Did the Bank present a genuine issue of material fact by presenting to the court evidence that it did not intend that its endorsement of the notes should give the Association recourse against it?
3. Was it proper for the court to award attorney's fees to the Association?
4. Was it reversible error, under Ind. Rules of Procedure, Trial Rule 58, for the trial courts to accept an unsolicited form of judgment from the Association?

The contentions of the parties will be dealt with as each issue is resolved.

## DECISION

*ISSUE ONE* – Are notes which are secured by mortgages of real estate negotiable instruments within the purview of the Uniform Commercial Code?

■ *PARTIES' CONTENTIONS* – The Bank contends that as Article 3 of the UCC declares itself subject to the provisions of Article 9,[1] and as Article 9 does not apply to liens on real estate,[2] it follows that mortgage notes, which are secured by liens on real estate, lie entirely outside the coverage of the Uniform Commercial Code.

The Association responds that the cited provisions of the UCC show only that the UCC does not regulate mortgages as a method of security; they do not show that the UCC does not apply to promissory notes secured by mortgages.

---

1. Ind.Code § 26–1–3–103(2):
 "The provisions of this article are subject to the provisions of the article on . . . secured transactions (Article 9)."

2. Ind.Code § 26–1–9–104(j):

 "*Transactions excluded from chapter.* – This article does not apply
 "(j) . . . to the creation or transfer of an interest in or lien on real estate . . . ."

*CONCLUSION*—So far as Article 3 of the Uniform Commercial Code is concerned, a promissory note secured by a mortgage is a negotiable instrument. The UCC provides the rules for the execution, transfer, and discharge of mortgage notes.

There is no question that the notes in the instant case are, and are intended to be negotiable instruments. They bear the signatures of their makers;[3] the notes contain unconditional promises to pay sums certain in money, and no other promises;[4] and they are made payable to the order of the Bank.[5] Further, the notes contain language which obviously contemplates that they should be negotiable.[6]

The Bank argues that while the notes are negotiable in form, the Uniform Commercial Code has exempted mortgage notes from its provisions.

To the contrary, Indiana courts have held that mortgage notes are subject to the general law of negotiable instruments, including the Uniform Negotiable Instruments Law, without regard to the fact that they are affected with an interest in real property. *Egbert v. Egbert* (1948), 226 Ind. 346, 351, 80 N.E.2d 104, 106.

Mortgage notes were subject to the general law on negotiable instruments before the Uniform Commercial Code, and we do not read the UCC as changing that state of affairs. Article 3 of the UCC is made "subject to the provisions of" Article 9, which governs secured transactions. UCC § 3–103(2). Section 9–104(j) says that *"This article does not apply . . . to the creation or transfer of an interest or lien on real estate."* (Emphasis added). The plain meaning of this language is that Article 9 of the UCC has no provisions relating to mortgages of real property. UCC § 9–104(j) silenc-

es Article 9 as to real estate mortgages; it does not purport to silence the entire Code. And because Article 9 says nothing about real estate mortgages, it cannot help the Bank to plead that the law of negotiable instruments is "subject to" Article 9.

That mortgage notes are still to be treated as negotiable instruments subject to the general law is made plain by the Indiana Commissioners' comment to § 9–104(j):

> The rights of a mortgagee of real estate are represented by the chose in action secured, and therefore, a security interest given by the mortgagee in the chose in action will be governed by the Code. Accord: *Walner v. Capron*, 224 Ind. 267, 66 N.E. (2d) 64 (1946) (pledge of note and mortgage extended to realty purchased on foreclosure); *Wheeler v. St. Paul Crushed Stone Co.*, 191 Ind. 75, 132 N.E. 1 (1921). Existing law will control claims of such secured party to the real estate. E. g., *Lane v. Schlemmer*, 114 Ind. 296, 15 N.E. 454 (1888); *Gabbert v. Schwartz*, 69 Ind. 450 (1880), both cases holding that a holder in due course of a negotiable instrument takes the mortgage freed of personal defenses.

Therefore, the threshold contention that the Uniform Commercial Code does not control the transfer of mortgage notes is without merit, and we proceed to the main issues.

## II.

*ISSUE TWO*—Did the Bank present a genuine issue of material fact by presenting to the trial court evidence that it did not intend that its endorsement of the notes should give the Association recourse against it?

---

3. UCC § 3–104(1)(a). When we make reference in this opinion to sections of the Uniform Commercial Code, it is to be understood that we mean the Indiana Uniform Commercial Code as found in Ind.Code 1971, §§ 26–1–1–101 through 26–1–10–106.

4. UCC § 3–104(1)(b).

5. UCC § 3–104(1)(d).

6. *"Negotiable* and payable at the TWIN CITY STATE BANK, GAS CITY, INDIANA, or at such other place as the holder may designate in writing. . . . The drawers *and endorsers* jointly and severally waive . . . . The makers *and endorsers* hearby agree . . . . In event of delinquency of any payment as herein provided, drawers *and endorsers* agree . . . ." (Emphasis added).

■ PARTIES' CONTENTIONS–The Bank believes that the transferor of a mortgage note transfers without recourse, unless he and his transferee explicitly agree otherwise. It says that by presenting certified records of the State Department of Financial Institutions that the Association never said that it had recourse against the Bank; and by displaying to the court the form of the endorsement on the notes, and the form of the transfer of the mortgages themselves, the Bank had shown probative evidence to contest the issue of recourse. Further, the Bank claims that it had raised the defense of estoppel against the Association when it showed that the Association did not respond when asked by the State Department of Financial Institutions about recourse on the mortgage notes.

The Association points out that the endorsement on the notes is an unqualified endorsement, and that both the NIL and the UCC imply as a matter of law that an unqualified endorser contracts to pay the instrument upon dishonor by the maker; and that the Bank has presented no evidence which the law could recognize as showing anything else. As for the claim of estoppel, the Association says that the facts which the Bank has alleged do not even arguably make out an estoppel.

*CONCLUSION*–The Bank did not present a genuine issue of material fact as to its intention in endorsing the notes without recourse.

■ The contract of an endorser is implied in law, unless the endorser takes the simple step of clearly indicating otherwise in his endorsement.

■ It is elementary that an unqualified endorser is liable upon the instrument, if the maker defaults. Section 3–414(1) of the UCC phrases it thusly:

> Contract of indorser–Order of liability.–(1) Unless the indorsement otherwise specifies (as by such words as "without recourse") every indorser engages that upon dishonor and any necessary notice of dishonor and protest he will pay the instrument according to its tenor at the

time of his indorsement to the holder or to any subsequent indorser who takes it up, even though the indorser who takes it up was not obligated to do so.

Sections 38 and 66 of the NIL are to the same effect. Indiana Statutes Annotated §§ 19–309, –507 (Burns 1950).

The Bank correctly reminds us that as between an endorser and his immediate endorsee, the transaction is to be viewed as a whole, as an ordinary contract. UCC § 3–119(1) says that "[a]s between the obligor and his immediate obligee . . . the terms of an instrument may be modified or affected by any other written agreement executed as a part of the same transaction . . . ." This is but a codification of the law in Indiana before the UCC. *Wood v. Ridgeville College* (1888), 114 Ind. 320, 16 N.E. 619; *Baum v. Nord* (1928), 88 Ind.App. 674, 164 N.E. 294.

What all this means is that in determining the obligations between the Bank and the Association, we are to look not only to the Bank's endorsements, but also to the contemporaneously executed contracts assigning the mortgages. Even so, we do not think that the endorsements and the contracts show that there is a genuine issue of material fact as to the objective intent of the Bank and the Association that the mortgage notes should be transferred without recourse.

Because the phrase "without recourse" appears nowhere in either the contracts or the endorsements, the Bank must show that the language it did use in transferring the notes was to the same effect as an endorsement without recourse. UCC § 3–414(1); NIL § 38, Indiana Statutes Annotated § 19–309 (Burns 1950). The Bank argues that the language of assignment used in both the endorsement of the note and in the contracts that assigned the mortgages, operated merely as an assignment of the title to the notes, and does not carry the contract of an endorser.

Such is not the case in Indiana. It is true that in some jurisdictions, an endorsement containing language such as "we hereby assign the within note," or, "we hereby

assign all right, title and interest in the within note," would operate merely to transfer title to the instrument, without engaging that the endorser would pay the note upon dishonor. *See, e. g., Hailey v. Falconer* (1858), 32 Ala. 536; *Aniba v. Yeomans* (1878), 39 Mich. 171. In 1897, our own Appellate Court flirted with this doctrine. *Bond v. Holloway* (1897), 18 Ind.App. 251, 47 N.E. 838.

In *Bond*, one of two copayees of a promissory note endorsed upon the note, "I sine [sic] over my interest on the within note to" his copayee. *Bond v. Holloway* is distinguishable from the case at bar on three points: *first*, the court evidently decided that the commercial law of Indiana at the time permitted it to examine the subjective intention of the endorser to determine that he meant merely to assign the instrument. Both the NIL and the UCC greatly curtail our ability to do this. We are, for instance, required to deem a person an endorser who has signed an instrument in an ambiguous capacity. NIL § 17, Indiana Statutes Annotated § 19–117(6); UCC § 3–402. And we must say that recourse is available against such an endorser, unless he plainly indicates otherwise. NIL § 38, Indiana Statutes Annotated § 19–309; UCC § 3–414(1).

*Second, Bond v. Holloway* in fact states a very narrow rule. Assuming without deciding that *Bond v. Holloway* survives as law after the passage of NIL and the UCC, it speaks only to the rare instances in which one copayee of a negotiable instrument signs over to his copayee his part–interest in the instrument. As that transaction would make the instrument more merchantable, and would likely be done in exchange for consideration that is not strictly related to the face value of the instrument, there is logic in favor of a special rule for assignments between copayees that does not exist in the usual case in which one holder endorses the whole instrument over to another.

Finally, it appears that the controlling precedent of the Supreme Court at the time of *Bond v. Holloway* (1897) was that in general, words of assignment in an endorsement of a negotiable instrument did not affect the character of the endorsement; the undertaking to pay the instrument upon dishonor was made regardless. *Henderson v. Ackelmire* (1877) 59 Ind. 540. This, in fact, was the rule in a majority of states as to words of assignment under the Negotiable Instrument Law. *See Fay v. Witte* (1933), 262 N.Y. 215, 186 N.E. 678; *Contra, Fecko v. Tarczynski* (1937), 281 Mich. 590, 275 N.W. 502. (Words assigning "right, title and interest" in a note constitute an endorsement without recourse, *in deference to controlling Michigan precedent*; but mere words of assignment amount to an unqualified endorsement.).

Thus, the Uniform Commercial Code merely reenacts the prior law in Indiana when it says, "Words of assignment ... and the like accompanying an endorsement do not affect its character as an endorsement." UCC § 3–202(4).

The endorsements and the assignment contracts therefore presented no issue of material fact, for by law their language was unambiguous. The language on the backs of the notes was, by NIL § 17 and UCC § 3–402, part of an endorsement; the terms of the assignment contracts were offered as showing the Bank's contract of endorsement. These writings contained nothing which Indiana law recognizes as being of the same import as the phrase "without recourse." The writings were unqualified endorsements of the notes, and unambiguously so. There being no ambiguity in the writings, the parol evidence rule forbade the trial courts' pursuing the matter further. The facts being undisputed—indeed, indisputable—it was proper for the courts to grant the Association's motion for summary judgment.

■ Retreating to the last ditch, the Bank seeks to block recourse by asserting that the Association's failure to provide a responsive answer to the Department of Financial Institutions' inquiry as to whether the mortgage notes were purchased with recourse estops the Association from seeking recourse against the Bank. This argu-

ment is without merit, for there was no estoppel.

The fundamentals of estoppel are these:

In order to constitute an equitable estoppel or estoppel *in pais* there must exist a false representation or concealment of material facts; it must have been made with knowledge, actual or constructive, of the facts; the party to whom it was made must have been without knowledge, or the means of knowledge of the real facts; it must have been made with the intention that it should be acted on; and the party to whom it was made must have relied on or acted on it to his prejudice. *Midland Building Industries, Inc. v. Oldenkamp et al.* (1952), 122 Ind.App. 347, 103 N.E. 451; 31 C.J.S. Estoppel § 67, p. 254.

Quoted in *Justice v. Mid–State Homes, Inc.*, (1970), 146 Ind.App. 662, 257 N.E.2d 843.

The record does not show that the Association engaged in a deliberate "concealment of material facts . . . made with knowledge . . . of the facts." To the contrary, it appears that the Association acted with that mixture of bewilderment and cooperation which often characterizes dealings between citizens and their government. The Bank might argue that the Association had constructive knowledge of whether there was to be recourse on the notes, for the Association was a party to the contract of endorsement. But so was the Bank a party to the contract of endorsement; so that if the Association knew that the notes were transferred with recourse, then so did the Bank, which therefore could not have been deceived.

Therefore, no estoppel is possible. The Bank is liable upon its endorsement.

### III.

*ISSUE THREE*–Was it proper for the court to award attorney fees to the Association?

■ *PARTIES' CONTENTIONS*–The Bank contends that to the extent the notes contain an undertaking to pay attorney fees, that undertaking is made to the holder, and not to the holder's attorney. The Bank says that since the Association's attorney testified that the Association had neither paid nor agreed to pay him his fees, the Association had therefore not been exposed to attorney fees, and was not entitled to compensation for fees it had not incurred. The Bank further objects to the method used to compute the attorney fees, and the sufficiency of the evidence to support the award.

The Association replies that whether it had specifically agreed with its attorneys on fees or not, it would still be liable to its attorneys for reasonable compensation for the work that the attorneys had done for it. Further, the Association says that the trial courts had used a reasonable method of computing the attorney fees, which did not amount to an abuse of discretion.

*CONCLUSION*–The trial courts did not abuse their discretion in awarding attorney fees to the Association.

■ It is fundamental, indeed essential, that one who makes his living performing useful services is entitled to compensation from persons on whose behalf and at whose behest he has performed such services. If there has been no agreement as to compensation, the performer of services is entitled to recover reasonable compensation on a theory of *quantum meruit. Potter v. Dailey* (1942), 220 Ind. 43, 40 N.E.2d 339. It is plain enough that the Association's lawyers have performed a valuable service for the Association in prosecuting lawsuits for them, and that the Association is therefore liable to its lawyers for their reasonable fees.

It follows that the Bank's argument that it can not be held to indemnify the Association for attorney fees for which the Association was not itself liable must go for naught. The Association is liable for reasonable attorney fees, and the Bank does not contest the proposition that if the Association is liable, then so is it.[7]

---

**7.** In its brief, the Bank indicates its doubts that the note requires it to pay attorney fees, but it does not bolster these doubts with any cogent argument or citation to authority. It has therefore waived these matters. *Appellate Rule* 8.3(A)(7).

The Bank also challenges the court's method of assessing the attorney fees. An award of attorney fees can be disturbed on appeal only if it amounts to an abuse of discretion. *Brames v. ·Crates* (1980), Ind. App., 399 N.E.2d 437; *Arnold v. Dirrim* (1979), Ind.App., 398 N.E.2d 426; *Lovko v. Lovko* (1978), Ind.App., 384 N.E.2d 166; *Fox v. Galvin* (1978), Ind.App., 381 N.E.2d 103; *Streets v. M.G.I.C. Mortgage Corporation* (1978), Ind.App., 378 N.E.2d 915.

The record shows that extensive hearings were held on the question of attorney fees. It developed that the Association's attorneys had been working on thirty–five foreclosures for the Association more or less simultaneously. The questions of law were essentially the same in each case, and it was proposed that attorney fees should be aggregated for the entire effort, and apportioned equally among the thirty–five cases. We cannot see how the Bank can complain of this scheme. To make separate determinations for each case would run the risk of either undercompensating or overcompensating the Association's attorneys for their efforts. In any event, no matter how the attorney fees are divided among these cases, the Bank would still be liable for its share of the sum, being a defendant in all of them.

 The Bank further protests that the fees were assessed even though the Association's lawyers presented no time records. We take judicial notice that it is not uncommon for lawyers to set their fees on other than an hourly rate basis. We therefore cannot see how it was an abuse of discretion for the trial courts to base their determination on the difficulty of the cases and the general amount of effort and skill required to prosecute them. *See Fitzgerald v. Wasson Coal Mining Corp.* (1965), 138 Ind.App. 176, 212 N.E.2d 398. Such factors are recognized in the Code of Professional Responsibility. DR 2–106(B). Indeed, a trial court might award attorney fees on the sole basis of its own observation of the trial, without hearing any evidence on the point. *Fox v. Galvin, supra.*

Finally, the Bank finds the trial court's allocation of the attorney fees in one of the cases between the Bank and the defaulting mortgagor objectionable. The court assessed $1,000.00 against the mortgagors, and $2,200.00 against the Bank. But once again, the Bank presents no cogent argument or authority to show why such an allocation is objectionable. It has therefore waived this point. AR. 8.3(A)(7).

The Bank has shown us no error in the award of attorney fees.

IV.

*ISSUE FOUR* -Was it reversible error, under Ind.Rules of Procedure, T.R. 58, for the trial court to accept an unsolicited form of judgment from the Association?

 *PARTIES' CONTENTIONS*–The Bank alleges that the form of judgment used in most of the cases before us was submitted by the Association to the courts unsolicited. As this contravenes T.R. 58, the Bank would have us vacate these judgments.

The Association responds that in fact two of the three trial courts did solicit forms of judgment, and that in the third court, the Bank failed to raise the issue in its motion to correct errors.

*CONCLUSION* --Regardless of the posture of the facts, the use of an unsolicited form of judgment by a trial court does not present an appealable issue.

T.R. 58 follows Federal Rules of Civil Procedure, Rule 58 in directing, "Attorneys shall not submit forms of judgment except upon direction of the court, and these directions shall not be given as a matter of course." The Indiana Civil Code Study Commission had no comments on this provision. *W. Harvey, Indiana Practice*, Rule 58, Civil Code Study Commission comments, pp.

44–45. The Federal Advisory Committee, in adopting this language, said this:

> Rule 58 is designed *to encourage all reasonable speed* in formulating and entering the judgment when the case has been decided. *Participation by the attorneys* through the submission of forms of judgment *involves needless expenditure of time and effort and promotes delay,* except in special cases where counsel's assistance can be of real value. See *Matteson v. United States,* 240 F.2d 517, 518–19 (2d Cir. 1956). Accordingly, the amended rule provides that attorneys shall not submit forms of judgment unless directed to do so by the court.

*Id.,* Federal Advisory Committee notes on 1963 amendment, p. 49 (Emphasis added).

The rule against attorneys submitting prepared forms of judgment, therefore, is one of judicial economy. The method of enforcement most consonant with the aim of judicial economy is for trial judges to ignore unsolicited forms of judgment if they are unwelcome. It would run against judicial economy for this part of T.R. 58 to be enforced by calling the entire appellate machinery into action for purposes little better than remanding the case to the trial court to have the judgment retyped on court stationery. We have no reason to believe that had the trial courts drawn up their own judgments, they would be in any way different from the judgments that were entered.

There is therefore no merit to the Bank's assignment of errors on this issue.

All cases consolidated in this appeal are affirmed.

SULLIVAN and SHIELDS, JJ., concurs.