**Charles O. FINLEY,
Appellant-Respondent,**

v.

**Shirley FINLEY, Appellee-Petitioner.**

**No. 3–780A202.**

Court of Appeals of Indiana,
Fourth District.

June 25th, 1981.
Rehearing Denied August 10, 1981.

John E. Hughes, Hoeppner, Wagner & Evans, Valparaiso, Robert J. Stucker, Vedder, Price, Kaufman & Kammholz, Chicago, Ill., for appellant-respondent.

John E. Newby, Leon R. Kaminski, Edward L. Volk, Newby, Lewis, Kaminski & Jones, La Porte, for appellee-petitioner.

CHIPMAN, Judge.

Charles O. and Shirley Finley's marriage was dissolved on December 31, 1979. The divorce decree made the following distribution of marital property using the stated valuations:

| PROPERTY | VALUATIONS | |
| --- | --- | --- |
| | TO WIFE | TO HUSBAND |
| Real Estate | | |
| Home Place | $480,000 | - 0 - |
| Carpenter Farm | - 0 - | 160,000 |
| Schultz Farm | - 0 - | 160,000 |

| | VALUATIONS | |
|---|---|---|
| PROPERTY | TO WIFE | TO HUSBAND |
| Securities | | |
| Common shares of various stocks | - 0 - | $1,270,097 |
| William Blair Accounts | | |
| Institutional Liquid Asset Fund | $967,786 | - 0 - |
| Deposit | - 0 - | 46,616 |
| Bank Accounts | | |
| Harris Trust & Savings | - 0 - | $ 14,543 |
| Gary National Bank | - 0 - | 5,940 |
| Certificates of Deposit | | |
| Illinois State Bank of Chicago | - 0 - | $ 293,488 |
| Harris Trust & Savings Bank | - 0 - | 398,739 |
| Life Insurance on Husband (cash surrender value) | $325,265 | $ 35,023 |
| Loan Due from Charles O. Finley & Co., Inc. (Illinois) | - 0 - | $ 661,073 |
| Furniture[1] | | |
| Jewelry | | |
| Wife's | $ 65,000 | - 0 - |
| Husband's | - 0 - | $ 4,000 |
| Finley & Friday, Inc. | | |
| Common stock | - 0 - | $ 250,000 |
| Charles O. Finley & Co., Inc. (Indiana) | | |
| 310 shares | - 0 - | $ 56,883 |
| 290 shares | $ 53,167 | - 0 - |
| Charles O. Finley & Co., Inc. (Illinois) | | |
| (no value assigned) | 290 shares | 310 shares |
| VALUED TOTAL | $1,891,218 | $3,356,402 |

On appeal Charles O. Finley (Husband) raises the following issues:

I. Did the trial court abuse its discretion in awarding the wife's attorneys $350,000 in legal fees and $13,000 for costs and requiring the Husband to pay the entire amount?

II. Should the trial court have distributed marital liabilities in the same proportion as the assets?

III. Did the trial court err in the valuation of:

A. The real estate?

B. The shares of Finley & Friday, Inc.?

C. The loan due from Charles O. Finley & Co., Inc. (Illinois)?

IV. Can the trial court treat the Husband's post-separation income as a marital asset?

V. Was the trial court's disposition of property reasonable under IC 31–1–11.5–11 in light of:

A. The disposition of the marital liabilities and

1. The furniture values were excluded from the trial court's consideration by stipulation of the parties.

B. Husband's contribution to the marital assets?

## I. ATTORNEY'S FEES

The trial court ordered Husband to pay Wife's attorneys' fees in the amount of $350,000 and costs of $13,000.[2] Husband asserts this amount is unreasonable as it is more than Wife's attorneys' fees based on a strict hourly rate.[3] In addition this amount is three times the customary hourly rate in the community based on Wife's attorneys' estimated time expended up to the entry of judgment.

The award of reasonable attorneys' fees under IC 31–1–11.5–16 is left to the broad discretion of the trial court, *e. g., Waitt v. Waitt,* (1977) 172 Ind.App. 357, 360 N.E.2d 268. In determining what sum, if any, is reasonable the trial court is not limited to considering only an hourly rate.

"Although an hourly rate is a factor to be considered in assessing attorney fees, it is not the sole factor. Traditionally, the size of the marital estate, the length of time necessary to obtain the desired result, and the possibility of appeal are other aspects to be weighed. *Burkhart v. Burkhart,* (1976) Ind.App., 349 N.E.2d 707."

*Johnson v. Johnson,* (1979) Ind.App., 389 N.E.2d 719, 722. In addition, in determining reasonable fees in other types of cases we have allowed consideration of quality of services, *Matter of Estate of Kingseed,* (1980) Ind.App., 413 N.E.2d 917 (Petition to Transfer pending), and difficulty of issues *First Valley Bank v. First Savings and Loan Association of Central Indiana,* (1980) Ind.App., 412 N.E.2d 1237.

Here evidence was presented which indicates that factors other than merely number of hours expended should be considered in determining the amount of reasonable fees. At trial several attorneys expressed their opinions on the value of the attorneys' services in response to a hypothetical question which delineated tasks performed by Wife's attorneys. Without burdening this opinion with the entire extensive hypothetical, it suffices to say that it set forth the following information: Up to the entry of the final decree this case involved litigation over a period of five years including one interlocutory appeal. 367 N.E.2d 1126. The value of the estate involved is far above the norm. During discovery Husband was less than cooperative with Wife's attorneys. Some discovery involved long distance travel and extensive auditing. The issues, in addition to normal divorce questions, included questions involving corporate and individual taxation, as well as corporate valuation and dissolution. In response to the hypothetical the experts' estimates of reasonable fees ranged from $335,000 to $417,880.

The trial court here clearly considered factors in addition to the time involved. The dissolution decree contains the following finding:

"The Court has considered the provisions of DR2–106 in the light of the testimony and evidence and in light of that which the Court itself knows of these proceedings. It is clear to this Court that this case could not have been so ably tried for either of the parties except, as it was, by experienced, knowledgeable lawyers of much more than average ability to establish the facts, discover the assets, to develop the evidence the intricacy of the relationship of the many facts of this litigation from the viewpoint of both of

---

**2.** Husband does not dispute the accuracy of costs totaling $13,000.

**3.** In his brief Husband also asserts (1) there is no evidence that Wife is not capable of paying all of her own attorneys' fees and (2) he should not be ordered to pay those fees generated by hearings on attorneys' fees. Both of these arguments have been waived for failure to include them in the Motion to Correct Errors. Indiana Rules of Procedure, Appellate Rule

8.3(A)(7). However, in regard to attorneys' fees we find that although Wife's attorneys did not specify the exact time devoted to the hearing on attorneys' fees, the record shows only 40 of the 1,895 pages were devoted to the subject of fees. This cannot be considered as an inordinate amount of time on this issue when we consider the duration of these proceedings and the mass of data and testimony furnished to the trial court.

the parties over more than five years including an appeal to the Court of Appeals as was done by the lawyers in this case is appropriate evidence of exceptional ability and experience. This knowledge and experience cannot be had in the bargain basement. To say that this work is to be compensated by a meager hourly rate flies in the face of economic and professional reality. It is to say that a General Motors clerk should be paid at the rate of the General Motors president—or that the president should be paid at the rate of the clerk. Or that open heart surgery should be paid for at the rate of a pedicure. Similarly here an hourly rate, though a factor to be considered, is not the sole factor. Traditionally the size of the marital estate, the length of time necessarily spent and the intricacy and difficulty of developing the case are compelling factors. Here is a protracted contest for which lawyers are entitled to (be?) [sic] paid for their labor. $350,000.00 is a reasonable fee and the husband should be ordered to pay it together with expenses incurred as hereinafter provided."

We believe there are factors present which weigh in favor of an award in excess of the customary hourly rate. Although the number of hours expended may give an indication of the complexity of the issues it can not definitively reflect the nature and quality of work provided during that time. Here the hours expended reflect services of a far greater variety than are usually involved in a dissolution of marriage case. We believe it was the quality of the work in such a variety of areas that the trial court was referring to in its General Motors analogy. Unlike the typical dissolution proceedings the quality of work in this case is an important consideration because of the variety of services the attorneys were required to provide.

The trial court's order mentions the size of the marital estate as an element to be considered in determining reasonable fees. This factor is also mentioned in *Johnson v. Johnson, supra,* and *Burkhart v. Burkhart, supra.* One of. Wife's expert witnesses at trial testified that attorneys' fees which amounted to two to three percent of the marital assets were not unreasonable. However, the percentage of marital assets was not the sole factor in arriving at the figure of $350,000. In explaining his use of a percentage rate he stated:

"Let me explain why I think the size of the estate is a factor. In my own mind what you do is you go through the other factors that I mentioned, degree of difficulty, responsibility of the attorneys, and you arrive at some fee which include [sic] hourly, and what I'm saying then is if you take that fee and compare it to the gross marital assets and if you end up with a fee that is in the range of two to three percent of gross marital assets, I'm saying that you have arrived at your fee in a reasonable manner and that that fee is not unreasonable."

The size of the marital estate may be one consideration in determining fee, i. e. in its relationship to the responsibilities of the attorneys, the type of services rendered and the complexity of the issues. However, we refuse to view the size of the marital estate as being of primary importance in determining attorneys' fees. The cases list this factor only as one of several elements to be considered. *Greiner v. Greiner,* (1979) Ind. App., 384 N.E.2d 1055; *Johnson v. Johnson, supra; Burkhart v. Burkhart, supra.* Consideration of the size of the marital estate should only be made in conjunction with the rest of the items delineated in *Code of Professional Responsibilities* DR2–106(B), see *U.S. Aircraft Financing, Inc. v. Jankovich,* (1980) Ind.App., 407 N.E.2d 287.

Since the trial court may award appellate fees, e. g. *Flora v. Flora,* (1975) 166 Ind. App. 620, 337 N.E.2d 846, an additional factor which might weigh in favor of compensation in excess of a strict hourly rate is the possibility of an appeal. Logically the trial court has before it only those hours expended before the judgment. If the trial court believes there is a high possibility an appeal might be perfected it is justified in taking those possible future hours into consideration in making an award. *Johnson v.*

*Johnson, supra; Burkhart v. Burkhart, supra.*

In this case, the trial court being cognizant of Husband's prior conduct, could have justifiably concluded that a second appeal would probably be taken. Therefore the court could have justifiably included the possibility of those future hours in the computation of reasonable fees. Husband's argument as to strict hourly rate could not take any of these appellate hours into consideration.

Taking all of these items: time expended, complexity of issues, variety of services, expertise and possibility of appeal into consideration we must determine if the trial court abused its discretion in arriving at the $350,000 figure. *U.S. Aircraft Financing v. Jankovich, supra.*

"In substance then the question becomes whether the fees ordered under the circumstances were so excessive as to be unsupported by the evidence and therefore erroneous as a matter of law. In evaluating such a contention this Court is strictly circumscribed to a determination of whether there is any evidence of probative value in support of the result reached by the trial court, since it is only where the evidence is without conflict and can lead to but one conclusion, and the trial court has reached an opposite conclusion, that the decision will be set aside as contrary to law."

*Greiner v. Greiner, supra* at 1057.

This trial court had before it a great deal of evidence on the issue of attorneys' fees.

It was aware of the time expended as reported by Wife's attorneys as well as reflected, by the pleadings, memoranda and depositions filed as well as the actual time spent in hearings. It also had first-hand knowledge of the complexity and variety of issues, the attorneys' expertise and the possibility of appeal. In addition, at trial Wife presented evidence on the monetary value of the attorneys' services in the form of expert testimony. We believe the above listed factors were considered by the experts when they expressed their opinions on reasonable attorneys' fees. Their opinions of reasonable fees ranged from $335,000 to $417,880.

The amount of fees ordered, $350,000 is unusually high for a dissolution case. However, we believe the trial court reached this sum by considering many factors in addition to a strict hourly rate as presented to him by the experts and his first-hand knowledge of the case. The figure is supported by the experts' testimony which was based on appropriate considerations and it is not our function to reweigh the evidence nor to substitute our judgment for that of the trier of facts. As such we cannot say the trial court abused its discretion in determining the amount of the attorneys' fees.

## II. MARITAL LIABILITIES

The trial court determined that Husband and Wife had certain contingent joint tax liabilities[4] and ordered Husband to pay them if they materialized. Husband con-

4. The trial court found:
"PERSONAL:
Joint personal (not corporate) Federal Income Tax liability for the years 1961 through 1966 inclusive $226,749.00 plus interest from and after July 31, 1979 at 6 percent.
CONTINGENT:
An unagreed item for Federal Income Tax purposes for 1965 is the determination of the character of $1,000,000.00 withdrawal from Charles O. Finley of Illinois by Charles O. Finley. Additional contingent leabilities [sic] exist for Federal Income Tax purposes for the taxable years 1972, 1973, 1974, 1975, 1976 and 1977."
and ordered:
"21. By a stipulation agreement between the parties and the United States government in tax court cases involving their joint returns for the calendar years 1961 through 1966 inclusive the parties have agreed to pay $225,749.12 plus interest at the rate of 6 percent from and after July 31, 1979. The husband is ordered to pay from the marital assets hereby set off to him this stipulated amount plus interest and penalty, if any, required by the stipulation. Any remaining obligation for the year 1965 shall be the sole responsibility of respondent husband and petitioner wife is relieved from any further liability for such taxes and from all costs and attorneys' fees accrued in the tax court cases involving the parties which the husband is ordered to pay and from which the husband shall hold the wife harmless."

tends the court must distribute joint marital liabilities in the same proportions as assets are distributed. We disagree.

The trial court is bound only by a requirement of reasonableness when determining a scheme of distribution of marital property, IC 31–1–11.5–11. The "property" discussed in IC 31–1–11.5–11 is defined in IC 31–1–11.5–2(d) as "all the *assets* of either or both parties" (emphasis added), no mention is made of liabilities.

However, this court in *In Re Marriage of McDonald*, (1981) Ind.App., 415 N.E.2d 75, discussed the meaning of the term "property" as used in IC 31–1–11.5–11. Although no reference to the definition contained in IC 31–1–11.5–2(d) is made the discussion is instructive:

"Property refers to physical objects such as cars, houses, and furniture. It also encompasses the complex group of jural relations between the owner of the physical object and all other individuals. *Nelson v. LaTourrette* (1961), 132 Ind. App. 584, 178, N.E.2d 67. When the trial court divides the property of the marital estate, it must also divide up these relationships. It may separate the debt relationship of the object from the equity relationship of the object."

*In Re Marriage of McDonald, supra* at 77. Thus this court in *McDonald, supra*, appears to include assets *and* liabilities in the definition of the term "property."

Taking this lead we must conclude the general term "assets" used in IC 31–1–11.5–2(d) is meant to be the more precise term "net assets" which takes into consideration the liabilities of the parties. Thus, the only requirement of distribution of assets and liabilities is one of reasonableness. Therefore, Husband's argument can only be that the court's distribution is unreasonable. We will discuss the trial court's decree under the requirement of reasonableness later in this opinion.

### III. VALUATION

#### A. Real Estate

Extensive appraisals of the three parcels of real estate were introduced into evidence. In sum they reflected the following conclusions:

| | Wife's Appraiser; July, 1975 | July, 1979 | Husband's Appraiser: Jan., 1976 | July, 1979 |
|---|---|---|---|---|
| Home Place: | $427,934.00 | $547,600.00 | $402,000.00 | $450,000.00 |
| Carpenter Farm: | $119,548.00 | $163,186.00 | $ 97,500.00 | $111,125.00 |
| Schultz Farm: | $126,260.00 | $167,524.00 | $124,200.00 | $151,800.00 |
| Totals: | $673,742.00 | $878,310.00 | $623,700.00 | $712,925.00 |

The trial court valued the properties as:

| | |
|---|---|
| Home Place: | $480,000.00 |
| Carpenter Farm: | 160,000.00 |
| Schultz Farm: | 160,000.00 |
| TOTAL | $800,000.00 |

Husband contends the trial court arrived at the *total* valuation of the properties by averaging the 1979 appraisals. From this premise he argues it was error for the court to then not average the 1979 appraisals of each individual piece of property to determine their values. Other than Husband's argument we find no indication this unique system of valuation was used to value the total real estate, or that the trial court ever concerned itself with the *total* value of the real estate.

Husband, in essence, requests we reweigh the evidence on this issue. We have repeatedly stated this is not our function. The values the trial court placed on the parcels of real estate are supported by the appraisals. We find no error.

#### B. Finley & Friday, Inc.

The trial court valued the Finleys' common stock (60% interest) in Finley & Fri-

day, Inc. at $250,000. Husband contends this is erroneous because (1) the only "competent evidence" was the book value of $33,000 and (2) the court's valuation was in actuality an attempt to distribute his future earnings from the company. We disagree with both of his contentions.

Mr. Retson, Husband's tax accountant, testified the $33,000 valuation of Finleys' stock in Finley & Friday, Inc. as it appeared in an unaudited financial statement he prepared was a "book value." Retson did not expand on this figure. He did not state whether this was par value, stated value or if the shares were in fact being sold presently for the amount he used in his computation. In addition, the financial statement from which he testified carried the following disclaimer:

> "Our work was limited to a compilation of a Balance Sheet from available data. A compilation is limited to presenting in the form of Balance Sheet information that is the representation of the individuals. We have not audited or reviewed the accompanying Balance Sheet, and accordingly, do not express an opinion or any other form of assurance on them."

Also admitted into evidence on the issue of valuation was Mr. Bernth's expert opinion that the 60% interest in Finley & Friday, Inc. as a going concern had a value of $363,000 to $415,000. Bernth was Wife's tax accountant whose testimony was admitted as an expert on the sale of insurance companies. Also in evidence are the financial statements of the company from 1971 to 1973, the small business corporation federal income tax returns from 1973 to 1976 and Mr. Retson's testimony that the combined officers' compensation and profits in 1975 were $202,012, in 1976 were $195,452 and in 1977 were $185,670.68.

It is not clear whether Husband uses the term "competent evidence" as admissible evidence or evidence offered by a competent expert. If he intends the first alterna-

tive his argument fails because, as stated above, there is other evidence in the record which is not contested from which one could determine the value of Finley & Friday, Inc. If he intends the second alternative his argument fails because he did not object to the admission of Bernth's opinion as an expert.[5] Clearly there was other "competent evidence" on the issue of valuation. In fact, we believe the above evidence contains sufficient information from which the trial court could have inferred a value of $250,-000.

Husband next contends the court's valuation was in actuality a distribution of future earnings. He supports this argument by citing the trial court's response to his Motion to Correct Errors in which the court stated:

> "2.g. A valuation of $250,000.00 of capital stock of a business producing salary to the respondent-husband in its fiscal year 1975 (petitioner's [sic] Exhibit 21) of $95,000.00 its fiscal 1976 (Exhibit 22) is not unreasonable."

We first note that the argument was not made in the Motion to Correct Errors and thus is waived. We also note Husband bases this argument exclusively on the trial court's mention of income in the quoted portion of the Memorandum on the Motion to Correct Errors. As an appellate court we must presume that the trial court's actions are correct and based upon acceptable reasons. In fact we must engage in every reasonable presumption in favor of the trial court's judgment. *E. g., State v. King,* (1980) Ind.App., 413 N.E.2d 1016. Husband invites us to disregard this restriction and engage in a presumption that the trial court based its valuation on illegal factors. This we will not do.

### C. Charles O. Finley & Co., Inc. (Illinois) Debt

In 1961 the Finleys loaned $1,661,073 to Finley of Illinois to allow the corporation to

---

5. Husband notes in his brief that the trial court "indicated he did not feel the opinion of Mr. Bernth had much weight." Husband fails to note that this comment was made during an extensive voir dire process to qualify Bernth as an expert in the sale of insurance companies. In addition Husband does not challenge Bernth's qualifications or otherwise assert his testimony was inadmissible, he only attacks its weight or credibility.

purchase the Kansas City Athletics baseball team. In 1965 one million dollars of the debt was repaid and $661,073 is still owing. Presently the Federal Internal Revenue Service contends the repayment is actually a payment of dividends which should be taxed at a rate of 70%. Husband contends the trial court erred by granting face value to the $661,073 debt because of the possible tax liability which would reduce the value of the asset to $200,000. He fails to cite any authority to support his position and thus, the issue is waived, A.R. 8.3(A)(7).

## IV. POST–SEPARATION INCOME

The trial court originally made the following distribution of the certificates of deposit:

"6. The following Certificates of Deposit representing the proceeds of the sale of jointly owned securities and now standing jointly in the names of the parties shall be and they are hereby transferred to the [sic] title thereto is vested in Charles O. Finley as his sole and separate property:

a. Illinois State Bank of Chicago      $166,902.87
   Face amount as of August 19, 1979.
b. Illinois State Bank of Chicago       266,939.54
   Face amount as of August 19, 1979
c. Harris Trust & Savings Bank          398,739.00
   Face amount as of August 19, 1979

---

Husband in his Motion to Correct Errors stated:

"2. The decision of the Trial Court is contrary to the evidence in the following respects:

a. The Court erroneously held in paragraph 6(b) of its order that a certificate of deposit with the Illinois State Bank of Chicago was of the face amount, $266,939.54, when the uncontradicted evidence was that the face amount was $226,936.54.

b. The Court erroneously held in paragraphs 6(a) and (b) of its order that the certificates of deposit at the Illinois State Bank of Chicago (total of approximately $393,000.00) were joint assets and were the result of the sale of jointly owned securities. The uncontradicted evidence was: (i) the certificates of deposit were partially joint and partially Mr. Finley's assets and were the result of the proceeds of joint assets,

Mr. Finley's assets and Mr. Finley's post-separation income including: ... for a total amount of $293,635.00; and the balance of approximately $100,000.00 was the result of Mr. Finley's earnings subsequent to the final separation of the parties; (ii) that the $293,635.00 total proceeds noted above resulted from proceeds of $210,751.00 from Mr. Finley's assets and only $82,737.00 from joint assets."

In response the trial court modified the original decree:

"2. Paragraph 6 of the decree heretofore entered herein is modified and amended to read as follows:

6. The following Certificates of Deposit shall be and they are hereby transferred to and title thereto is vested in Charles O. Finley as his sole and separate property:

(a) Illinois State Bank of Chicago

face amount as of August 19, 1979..$166,902.87

(b) Illinois State Bank of Chicago

face amount as of August 19, 1979.. 226,936.54

### (c) Harris Trust & Savings Bank

face amount as of August 19, 1979.. 398,739.00

---

Those Certificates of Deposit described and referred to 6(a) and 6(b) and issued by the Illinois State Bank of Chicago having stood in the separate name of the respondent-husband, $210,751.00 of their total having been funds separately owned by the respondent-husband, $82,737.00 having been proceeds of jointly owned assets."

Husband contends the trial court failed to remove the $100,000 post-separation income from the marital assets encompassed by the Illinois State Bank of Chicago certificates of deposit. Based on our reading of the trial court's order we disagree.

The portions of the modified order replacing 6(a) and (b) only describe the face value of certificates held by the Illinois State Bank of Chicago. The remainder of paragraph 6 explains only $293,488 contained in those certificates are marital assets: $210,-751 of it "having stood in the separate name" of Husband and $82,737 of it "having been proceeds of jointly owned assets." [6] Thus the trial court has already corrected the error in response to Husband's Motion to Correct Errors.

■ On appeal Husband contends the trial court erred by not including as a marital asset $34,500 income Wife received from farming jointly owned real estate after the separation. However, he has waived this issue for failure to include it in his Motion to Correct Errors. A.R. 8.3(A)(7).

---

**6.** Additionally on appeal Husband asserts the trial court erred by not finding the certificate of deposit at the Harris Trust and Savings Bank was separately owned by him. However, he has waived this issue by failing to include it in the Motion to Correct Errors. A.R. 8.3(A)(7).

Nonetheless, we note the asset's description as either jointly or separately owned is of no consequence under IC 31–1–11.5–11(b) which states in part:

"In an action pursuant to section 3(a) of this chapter, the court shall divide the prop-

---

## V. REASONABLENESS OF DISTRIBUTION

### A. Marital Liabilities

■ The trial court ordered Husband to pay the parties' contingent and realized Federal Income Tax liabilities. Those are (1) a $226,749 agreed liability for 1961–65, (2) a liability for 1972–74 for which the IRS proposed a $172,860 settlement,[7] and (3) the IRS claim for $1,250,000 (which includes interest from 1965) based on their assertion that the $1,000,000 Finley of Illinois repaid on the $1,616,000 loan in 1965 was a dividend instead of repayment.

Husband here claims the trial court failed to consider the effect of these tax liabilities in making the distribution of property. We cannot believe Husband is asserting the trial court totally overlooked the value of these liabilities since they are dealt with rather extensively in the final decree. There the trial court discussed their inception, growth and present value and set forth their distribution with particularity:

"all [sic] of these assets have always been in the exclusive possession and under the individual control of the husband who has from time to time sald [sic], endorsed the wife's name and delivered for transfer jointly owned securities in accordance with a pattern of conduct developed over many years . . . .

Because of this pattern of conduct heretofore mentioned and despite the sep-

erty of the parties, whether owned by either spouse prior to the marriage, acquired by either spouse in his or her own right after the marriage and prior to final separation of the parties, or acquired by their joint efforts, in a just and reasonable manner."

---

**7.** Husband in his Reply Brief states that this liability was resolved in Tax Court on September 11, 1980 for approximately $212,500. However this information was not available to the trial court and thus cannot be considered by us.

aration of the parties in 1974, there has continued to the trial an inextricable identity of financial interests which, as will be seen, bears importantly on the distribution of their assets.

As an example, the evidence is that the parties have filed joint income tax returns for the years 1961 through 1977 and, during the pendency of this cause, have agreed to settle additional tax liabilities with the Internal Revenue Service for the years 1961 through 1966 for $226,-749.12 not including interest. Unsettled for the year 1965 is a claim which could involve an additional liability of $1,250,-000.00 which includes interest on an approximately $700,000.00 additional tax assessment. The IRS has proposed an additional assessment of $125,540.00 for the years 1972, 1973 and 1974 which with interest would approximate $162,869.00. The IRS is also proposing the dissolowance [sic] of certain deductions which could result in additional liability of approximately $21,655.00 excluding interest. All of this is solely due to the husband's unilateral determination to make the tax returns as made. However, it is important to note that the wife's joinder in tax returns for 1975, 1976 and 1977 resulted in a reduction of tax liability for those years of about $205,812.00.
. . . ."

### "LIABILITIES:

PERSONAL:
Joint personal (not corporate) Federal Income Tax liability for the years 1961 through 1966 inclusive $226,749.00 plus interest from and after July 31, 1979 at 6 percent.
CONTINGENT:
An unagreed item for Federal Income Tax purposes for 1965 is the determination of the character of $1,000,000.00 withdrawal from Charles O. Finley of Illinois by Charles O. Finley. Additional contingent leabilities [sic] exist for Federal Income Tax purposes for the taxable years 1972, 1973, 1974, 1975, 1976 and 1977.

. . . .

IT IS ORDERED:

. . . .

21. By a stipulation agreement between the parties and the United States government in tax court cases involving their joint returns for the calendar years 1961 through 1966 inclusive the parties have agreed to pay $225,749.12 plus interest at the rate of 6 percent from and after July 31, 1971. The husband is ordered to pay from the marital assets hereby set off to him this stipulated amount plus interest and penalty, if any, required by the stipulation. Any remaining obligation for the year 1965 shall be the sole responsibility of respondent husband and petitioner wife is relieved from any further liability for such taxes and from all costs and attorneys' fees accrued in the tax court cases involving the parties which the husband is ordered to pay and from which the husband shall hold the wife harmless.

The respondent husband is ordered to pay the costs of defense of any matters involving the joint income tax returns of the parties for the years 1972, 1973, 1974 or subsequent all amounts finally found due and payable to the United States government or any other taxing authority for additional taxes, penalty or interest thereon. Both parties deny all liability for any additional tax on income for the years 1972, 1973 and 1974 or subsequent years through 1977 and no assessment has been made."

We must assume Husband actually contends that if all of the nearly 1.5 million dollar liabilities come to fruition the resultant distribution would be unreasonable. Even if this were to occur Husband's share of marital assets would be reduced to a sum ($1.85 million) which would put him nearly at par with the court's distribution to Wife ($1.89 million). As such we do not believe the evidence leads unerringly to the conclusion Husband asserts. As stated previously in this opinion we must engage in every reasonable presumption in the trial court's favor. *State v. King, supra.* Husband has

failed to present sufficient argument or evidence which would rebut the presumption that the trial court took the contingent liabilities into consideration.

### B. Husband's Contribution

Husband contends the trial court failed to place sufficient weight on his contributions in amassing the marital assets. He asserts that of all of the factors listed in IC 31–1–11.5–11(b) only one is applicable to this situation; that is:

"1) The contribution of each spouse to the acquisition of the property."

If this factor were given exclusive consideration he alleges the court should have granted him far in excess of the amount granted to Wife since her contribution "played no direct, causative role in the creation of the considerable wealth the trial court was called upon to distribute."

The trial court took into consideration the role *both* parties played in amassing their marital assets. The final decree supports the inference that the trial court, unlike Husband, believed Wife participated in making their financial growth possible. It states:

"The husband has single-mindedly and by ingenuity, ability, compulsive, consuming energy and effort produced wealth which has made it possible for him to have made himself a national figure in professional sports as once owner of a professional basdetball [sic] team, hockey team and, most notably, the Kansas A's now the Oakland A's baseball tema [sic] of the American Baseball League. This effort left all of the family duties to the wife who nevertheless participated importantly in the beginning years in the husband's business affairs and always thereafter in whatever role the husband desired or required on the level and in the manner of living he selected and provided. This included not only busimess [sic] entertaining at the family dwelling but also accompanying him on busimess [sic] trips as an aide to him in entertaining business prospects and prospective team athletes and their families. Some understanding of the responsibility may be reached from knowing that the evidence is that the family dwelling in LaPorte County was a nineteen or twenty room house with seven bathrooms and one half-bathroom plus two baths in the cabana at the swimming pool. At this family dwelling the wife managed whatever business entertaining was required by the husband. Along the way the wife bore eight children seven of whom have survived to their majority.

As the husband advanced in busimess [sic] and in sports he was frequently away from home for extended periods thus leaving to the wife the raising of seven children and the care and management of the family and household."

Although Wife was not independently employed outside the home the court found she did contribute to the marriage. Both spouses are not required to have engaged in income generating activity in order to share in the marital assets. In fact, IC 31–1–11.-5–11(b)(1) states that the contribution of a homemaker shall be considered by the trial court in determining the just and reasonable distribution of marital property.

In addition the distribution indicates the trial court also considered other factors listed in IC 31–1–11.5–11(b), such as:

"(5) The earnings or earning ability of the parties as related to a final division of property and final determination of the property rights of the parties."

The majority of the property granted to Husband is in the form of securities, family business related interests (loan from Finley of Illinois and the interest in Finley & Friday, Inc.), and securities, whereas the bulk of Wife's property is in a liquid asset account and the "Home Place." The trial court discussed a pattern of conduct developed by the parties in which Husband exerted exclusive control over the financial end of the business dealings. The trial court found:

"Investment securities and certificates of deposit or deposits in banks are registered in the names of the husband and wife jointly or in the husband's name alone as will hereafter appear.

all [sic] of these assets have always been in the exclusive possession and un-

der the individual control of the husband who has from time to time sald, [sic] endorsed the wife's name and delivered for transfer jointly owned securities in accordance with a pattern of conduct developed over many years."

Thus, one could conclude the trial court granted the chosen properties to the Husband to allow him to continue his income generating activities and take advantage of his chosen financial positions.

By taking the factors listed in IC 31–1–11.5–11 into consideration the trial court must set forth a disposition which is "just and reasonable." Our review of that determination can not be a reweighing of the evidence and reconsideration of those factors. We only examine the disposition for an abuse of discretion. E. g., *Irwin v. Irwin*, (1980) Ind.App., 406 N.E.2d 317. Abuse of discretion is evidenced only when the disposition is clearly against the logic of the facts before the court, *e. g., Irwin v. Irwin, supra; In Re Marriage of Davis*, (1979) Ind.App., 395 N.E.2d 1254. Here Husband has not demonstrated this to be the case.

Finding no reversible error, we affirm.

YOUNG, P. J. and MILLER, J., concur.